**STEEL IMPROVEMENT & FORGE COMPANY**

v.

**The UNITED STATES.**

No. 407–62.

United States Court of Claims.

Jan. 21, 1966.

Eldon H. Crowell, Washington, D. C., attorney of record, for plaintiff, Brooks W. McCracken, McAfee, Hanning, Newcomer, Hazlett & Wheeler, Cleveland, Ohio, of counsel.

George M. Beasley III, U. S. Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

DURFEE, Judge.

This contract case is before the court on cross motions for summary judgment. The parties have stipulated the facts— the relevant ones of which are included in the body of this opinion.

In 1953, the Government, represented by the Bureau of Ships, Department of the Navy, entered into a contract with Round-Woodhouse Chain and Manufacturing Company (hereinafter Round), for the delivery of a large quantity of chain and chain assemblies. Round entered into a subcontract with a related company, Ohio Hoist and Manufacturing Company (hereinafter Ohio), under which Ohio was to supply certain components for the assemblies. The latter, in turn, by purchase order, contracted with plaintiff for the delivery of forgings

needed for the performance of the subcontract with Round.

By telegraphic notice to Round, dated March 11, 1954, the contracting officer partially terminated the prime contract for the convenience of the Government. Round was advised to issue similar notices to its subcontractors and to advise defendant if it intended to file a termination claim. Plaintiff was notified the next day, and was requested to inform Ohio of any claims plaintiff had.

In a letter to Ohio, dated April 1, 1954, enclosing four copies of standard Government settlement proposal forms, together with supporting schedules, plaintiff set forth its partial termination claim. Plaintiff stated it had no further use for 37,362 pounds of steel purchased for the terminated portion of the contract, and requested that if Ohio had no immediate use for the inventory, it should so advise plaintiff so that plaintiff could file the claim with the Government, asking the Government for disposition of the material. Ohio replied by letter of April 5, advising plaintiff it had no use for plaintiff's inventory, and that plaintiff's claim was being processed as quickly as possible.

Plaintiff wrote the Inspector of Naval Material, Cleveland, Ohio (INSMAT Cleveland) on April 7, 1954, asking INSMAT Cleveland to arrange to take the necessary steps to dispose of plaintiff's inventory. Multiple copies of the settlement proposal and inventory schedules were included in the letter. These copies of plaintiff's settlement proposal were received by INSMAT Cleveland before the prime contractor's settlement proposal (which included plaintiff's claim as a part of Ohio's claim against it) was submitted. The prime's claim was submitted on June 7, 1954.

Thereafter, Government auditors visited plaintiff's plant, conferred with plaintiff's representatives and examined the cost figures included in the termination claim. The auditors recommended the total settlement figure be approved in the sum of $21,281.35.

On June 12, 1954 Ohio filed copies of its settlement proposal directly with INSMAT Cleveland. There is evidence that Ohio also forwarded copies of plaintiff's settlement proposal to INSMAT Cleveland at the same time. Ohio stated in its letter of transmittal that Round, the prime, had advised Ohio that it had no need for plaintiff's inventory. Thereafter, on July 22, plaintiff notified Ohio of a revision of plaintiff's original claim which had been reduced as a result of the aforementioned Government audit. Plaintiff instructed Ohio that the revised records were "to be delivered to the representative from the Navy."

On July 26, 1954 INSMAT Cleveland wrote Ohio informing it that a review of plaintiff's settlement claim had been completed; that Ohio should negotiate a settlement with plaintiff, and that Ohio should forward the proposed settlement to Round who would include it in its (Round's) final claim.

INSMAT Cleveland then wrote plaintiff to inform it that the Bureau of Ships had issued instructions for the shipment of the termination inventory to the Naval Supply Depot, Mechanicsburg, Pennsylvania. The termination inventory was shipped by plaintiff on October 6, 1954.

Plaintiff's termination claim settlement with Ohio was approved by the Government on June 22, 1955 in the sum of $21,281.35. Ohio's termination claim settlement with Round in the sum of $23,650.80 was approved by the Government on August 1, 1955.[1] Thereafter, on September 14, 1956 the contracting officer, Bureau of Ships, recommended a final settlement with Round in the amount of $29,552.59.[2]

At that juncture all that remained was for the Government to formally approve the settlement and pay Round, who in turn would pay Ohio, who would then pay plaintiff. Unfortunately for plaintiff, however, the settlement with Round was

1. This sum included $21,281.35 allocated to Ohio's settlement with plaintiff.

2. This included sums allocated to the claim of Ohio.

not consummated because of claims which the Government had against Round arising out of this and other contracts between Round and the Bureau of Ships.

Thereafter Ohio went into bankruptcy, and Round was dissolved. Round's assets passed into the hands of its stockholders. Neither Round, Ohio, nor plaintiff recovered from the Government any of their losses caused by the partial termination for convenience by the Government. Plaintiff twice subsequently communicated with the Bureau of Ships[3] demanding payment, but to no avail. On July 1, 1960 plaintiff, having received no decision on the claims submitted to the Bureau of Ships, filed a claim with the Comptroller General. On July 26, 1961 the Comptroller General issued a settlement certificate denying plaintiff's claim. Motion for reconsideration was denied March 2, 1962. Plaintiff then filed its petition in this court.

Plaintiff contends that either an express contract between it and defendant arose when defendant allegedly accepted plaintiff's offer to settle its termination claim directly with defendant, or that an implied contract to pay for the termination inventory was created when the Bureau of Ships directed plaintiff to ship the material to a Government depot, and accepted delivery of the material. Alternatively, plaintiff seeks to recover on the theory that the instructions by defendant to ship the inventory material, together with the refusal to pay plaintiff, constituted a Fifth Amendment taking.

■ Defendant has raised various defenses including a lack of privity, the statute of limitations, and equitable estoppel. A discussion of all the defenses raised by defendant is not necessary, as this court believes that plaintiff's claim is barred by the statute of limitations, 28 U.S.C. § 2501 (1964 ed.) This statute provides that claims in this court shall be barred unless the petition is filed " * * * within six years after such claim first accrues." The rule that a claim based on a contract with the Government first accrues, and the statute of limitations begins to run "when it can be definitely ascertained and set up, when all that is required of him by the terms of the contract has been fulfilled by the contractor," is too well established to now attempt to controvert. L. E. Myers Co. v. United States, 64 F.Supp. 148, 149, 105 Ct.Cl. 459, 478 (1946). See also International Potato Corp. v. United States, 161 F.Supp. 602, 604, 142 Ct.Cl. 604, 606 (1958); Battelle v. United States, 7 Ct.Cl. 297 (1871); State Tent and Canvas Company v. United States, 130 F.Supp. 384, 131 Ct.Cl. 215 (1955).

■ In the instant case plaintiff contends that an express contract was created when defendant directed plaintiff to ship the termination inventory. If an express contract had been created, then plaintiff completely performed its obligations under the contract at the time of the shipment (October 6, 1954). Since this suit was not filed until more than six years after October 6, 1954, plaintiff's claim is time barred. The same logic and rationale holds for an implied contract. If any contract could be implied, as plaintiff contends, by the totality of the actions of the parties, then again, plaintiff had completely performed its part of the implied bargain on the date of shipment of the materials (October 6, 1954). It was at that time that any cause of action plaintiff might have had on an implied contract accrued. Plaintiff is, therefore, also barred by the statute of limitations on its implied contract theory.

■■ Plaintiff has argued that the statute of limitations did not begin to run until a decision was made on its claim by the Government. However, as we have shown, all events had occurred fixing liability under either of plaintiff's contract theories on the date that plaintiff shipped the materials. Immediately thereafter, plaintiff could have brought

3. April 1957, and February 1958.

suit. Recourse to an agency was not a prerequisite of suit. It is only when pursuance of administrative remedies is a prerequisite to suit that the statute of limitations is suspended or tolled by such pursuance. See Empire Institute of Tailoring, Inc. v. United States, 161 F. Supp. 409, 411, 142 Ct.Cl. 165, 168 (1958), and cases cited therein.

■ Plaintiff has relied heavily on Manufacturers Aircraft Ass'n v. United States, 77 Ct.Cl. 481, 522–523 (1933), cert. denied, 291 U.S. 667, 54 S.Ct. 442, 78 L.Ed. 1057 (1934) for the proposition that its cause of action did not arise until the claim had been denied by the Government. That case is inapposite to the situation here. It held that as a result of implication of practice, the parties to an implied contract agreed to a time when payment under the contract became due. Plaintiff there had no cause of action until the payments became due. In the case at bar, there is no prior practice of the parties upon which this court could find that the parties intended payment to become due at a time subsequent to the delivery of the inventory. Plaintiff's argument must, therefore, fail.

■ Plaintiff's Fifth Amendment taking theory would likewise be barred by the statute of limitations. It is axiomatic that a cause of action for an unconstitutional taking accrues at the time the taking occurs. Stafford Ordnance Corp. v. United States, 108 F.Supp. 378, 123 Ct.Cl. 787 (1952); Chan Lai v. United States, 125 Ct.Cl. 142 (1953). Assuming that the Government unconstitutionally took possession of plaintiff's property, such taking was accomplished when the goods were shipped to defendant in October 1954—more than six years prior to the filing of the petition in this case on December 29, 1962.

Plaintiff's final contention is likewise non-meritorious. In essence, plaintiff contends that its case was submitted to the Comptroller General within the six-year period of limitations, [admittedly true] and should be deemed to have been referred to the Court of Claims for adjudication under 28 U.S.C. § 2510 (1964 ed.). This statute states:

§ 2510. Referral of cases by Comptroller General.

The Comptroller General may transmit to the Court of Claims for trial and adjudication any claim or matter of which the Court of Claims might take jurisdiction on the voluntary action of the claimant, together with all vouchers, papers, documents and proofs pertaining thereto.

The Court of Claims shall proceed with the claims or matters so referred as in other cases pending in such court and shall render judgment thereon.

■ Plaintiff believes that the last sentence of the Comptroller General's denial of plaintiff's claim for reconsideration constituted a transmittal of the case to this court, which would thereby enable plaintiff to elude the bar of limitations. The denial of the motion for reconsideration stated:

The position of the Department of the Navy with respect to the claim is that the actions of the Government representatives did not establish an implied contract. As noted above, it is our conclusion that there is evidence to support the Navy's position. On the other hand, as indicated, there is also support for your position. In view of the substantial and significant question remaining unresolved, it is our duty to resolve the doubt in favor of that course which will result in the conservation of appropriated funds and *leave to the proper judicial authority the final determination of the matter.* Charles v. United States, 19 Ct.Cl. 316; Longwill v. United States, 17 Ct.Cl. 288. Accordingly, the denial of your claim is sustained. [Emphasis added.] [Comp.Gen.Dec. B–147131, Mar. 2, 1962]

It is not necessary to present an analytic consideration of the legislative history of § 2510, or its case law, to answer

plaintiff's arguments. We believe that a fair reading of the last sentence quoted above clearly shows plaintiff to be in error. There are no words of transmittal or referral in the above-quoted language. Plaintiff was merely being advised of the option of seeking judicial review of its claim. Had the Comptroller General intended to refer or transmit the case to this court, we believe that, in the least, the Comptroller General would have either mentioned the applicable statute or the Court of Claims. Plaintiff's rather novel interpretation of the above italicized words fails to impress or persuade this court.

Accordingly, plaintiff's motion for summary judgment is denied; defendant's motion for summary judgment is granted, and the petition is dismissed.