37 F.3d 1478
 ALLIANCE OF DESCENDANTS OF TEXAS LAND GRANTS (for themselves
and a class of other individuals similarly situated,
totalling 1064), and Blanca Rosa Villarreal Aguirre (for
themselves and a class of other individuals similarly
situated, totalling 200), Plaintiffs-Appellants,
v.
The UNITED STATES, Defendant-Appellee.
 Nos. 93-5140, 93-5141.
 United States Court of Appeals,
Federal Circuit.
 Oct. 6, 1994.
Rehearing Denied; Suggestion for Rehearing In Banc Declined
Dec. 7, 1994.
 
 E. Cooper Brown, Atty., Kohn, Kohn & Colapinto, Washington, DC, argued, for plaintiffs-appellants. With him on the brief was Willard G. Holgate. Of counsel was Stephen J. Schnably.
 Jacques B. Gelin, Atty., U.S. Dept. of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief were Lois J. Schiffer, Acting Asst. Atty. Gen., Martin W. Matzen and Silvia Sepulveda-Hambor.
 Before NEWMAN, MICHEL, and RADER, Circuit Judges.
 RADER, Circuit Judge.
 
 
 1
 The United States Court of Federal Claims held that the statute of limitations bars the takings claims of Blanca Rose Villarreal Aguirre and the Alliance of Descendants of Texas Land Grants. Alliance of Descendants of Texas Land Grants v. United States, 27 Fed.Cl. 837 (1993) (Alliance ). Because 28 U.S.C. Sec. 2501 (1988 & Supp. V 1993) applies to these claims, this court affirms.
 
 BACKGROUND
 
 2
 The claimants in this case are the heirs and descendants of Mexican nationals who received land grants, in what is now Texas, from Spain or Mexico before 1836. Thus, the claimants' forebears owned land in Texas before its independence from Mexico in 1836. During the hostilities which included the battle at the Alamo, the Texans seized these lands from the claimants' forebears. In all, the claimants allege that the Texans divested their forebears of title to approximately twelve million acres of land. In 1845, Texas joined the United States.
 
 
 3
 Disputes over borders contributed to the Mexican-American War. After that conflict ended in 1848, the United States and Mexico entered into the Treaty of Peace, Friendship, Limits, and Settlement, Feb. 2, 1848, 9 Stat. 922. The 1848 Treaty, however, did not fully resolve claims of both Mexicans and Texans to land held before 1836. Mexican citizens claimed land in Texas; Texans, now American citizens, claimed land in Mexico. These claims persisted into the 1920s.
 
 
 4
 In 1923, the United States and Mexico entered into the Convention for Reciprocal Settlement of Claims, Sept. 8, 1923, 43 Stat. 1730. This Treaty created a General Claims Commission (Commission) to resolve these persistent land grant disputes on both sides of the border. As of 1940, however, the Commission had not resolved many disputes.
 
 
 5
 In 1941, the United States and Mexico entered into the Convention Providing for the Final Adjustment and the Settlement of Certain Unsettled Claims, Nov. 19, 1941, 56 Stat. 1347 (1941 Treaty). Under the 1941 Treaty, Mexico and the United States released one another from all liability from land grant claims with the Commission. Article III of the 1941 Treaty declared that the United States and Mexico:
 
 
 6
 [R]eciprocally cancel, renounce, and hereby declare satisfied all claims, of whatsoever nature, of nationals of each country against the Government of the other, which arose prior to the date of the signing of this Convention, whether or not filed, formulated or presented, formally or informally, to either of the two Governments....
 
 
 7
 1941 Treaty, art. III, 56 Stat. at 1350. By 1948 the United States had, pursuant to its domestic law, satisfied the claims of its citizens. To this date, however, Mexico has not satisfied the claims of its nationals.
 
 
 8
 The unsatisfied Mexican claimants filed a class action against the United Mexican States in the United States District Court for the District of Columbia on September 18, 1981, seeking damages for Mexico's uncompensated taking of the Texas land grant claims. The court dismissed the case for lack of subject matter jurisdiction. Asociacion de Reclamantes v. United Mexican States, 561 F.Supp. 1190, 1201 (D.D.C.1983), aff'd, 735 F.2d 1517 (D.C.Cir.1984).
 
 
 9
 In 1989, Mexico finally determined that it would pay no compensation to claimants under the 1941 Treaty. Heirs and descendants of the original Mexican grantees then filed three complaints against the United States in the Court of Federal Claims. These complaints seek compensation for the United States' alleged taking of the Texas land grant claims. The trial court consolidated these claims on September 27, 1990. Alliance of Descendants of Texas Land Grants v. United States, No. 90-368L (Fed.Cl., filed Apr. 27, 1990); Blanca Rosa Villarreal Aguirre v. United States, No. 90-466L (Fed.Cl., filed May 24, 1990); Salome Adame v. United States, No. 90-488L (Fed.Cl., filed June 5, 1990).
 
 
 10
 The claimants moved for summary judgment on the issue of liability and for partial summary judgment on the issue of damages. The United States filed a motion to dismiss or, in the alternative, for summary judgment. In support of its motion, the United States pleaded as an affirmative defense, among others, that the claims were time-barred.
 
 
 11
 The Court of Federal Claims found that the claimants did not satisfy the statute of limitations, nor show facts sufficient to toll it. The court therefore granted summary judgment to the United States and dismissed the complaints. Alliance, 27 Fed.Cl. at 846. The claimants appealed, and this court consolidated the appeals on July 23, 1993.
 
 DISCUSSION
 
 12
 A trial court properly grants summary judgment only when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed.Cir.1987). This court reviews a grant of summary judgment by the Court of Federal Claims de novo. Keystone Retaining Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444, 1449 (Fed.Cir.1993).
 
 
 13
 A six-year statute of limitations governs claims before the United States Court of Federal Claims.
 
 
 14
 [E]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the [claim] thereon is filed within six years after such claim first accrues.
 
 
 15
 28 U.S.C. Sec. 2501 (1988 & Supp. V 1993). A claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action. Japanese War Notes Claimants Ass'n v. United States, 373 F.2d 356, 358, 178 Ct.Cl. 630 (1966), cert. denied, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967).
 
 
 16
 A claimant under the Fifth Amendment must show that the United States, by some specific action, took a private property interest for a public use without just compensation. Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 294, 101 S.Ct. 2352, 2369-70, 69 L.Ed.2d 1 (1981). Therefore, a claim under the Fifth Amendment accrues when that taking action occurs. Steel Improvement & Forge Co. v. United States, 355 F.2d 627, 631, 174 Ct.Cl. 24 (1966).
 
 
 17
 Before ascertaining the time of any alleged taking action, this court examines what private property the United States allegedly took. The claimants allege that the United States "took" their property interest in a legal cause of action. The claimants do not in this suit allege a taking of the land in Texas itself. Rather they allege that the United States took away their legal right to sue for compensation for that land. Because a legal cause of action is property within the meaning of the Fifth Amendment, Cities Servs. Co. v. McGrath, 342 U.S. 330, 335-36, 72 S.Ct. 334, 337-38, 96 L.Ed. 359 (1952); Ware v. Hylton, 3 U.S. (3 Dall.) 199, 245, 1 L.Ed. 568 (1796), claimants have properly alleged possession of a compensable property interest.
 
 
 18
 Next this court examines when the United States allegedly took this interest and set the clock running on the six-year statute of limitations. The Court of Federal Claims determined:
 
 
 19
 It seems clear that the 1941 Treaty effectively extinguished the land grant claims here in issue.... At the latest, the alleged taking occurred with the signature of the Treaty on Final Settlement of Certain Claims in 1941....
 
 
 20
 Alliance, 27 Fed.Cl. at 840, 842. Indeed the 1941 Treaty's terms released the United States from all liability for Texas land grant claims from Mexican citizens. Article III of the 1941 Treaty released the United States from "all claims, of whatsoever nature," from Mexican citizens.
 
 
 21
 The claimants' takings claims thus accrued when the 1941 Treaty went into effect. At that point, the six-year clock began ticking. Because the 1941 Treaty went into force in April 1942, any takings challenge based upon it must necessarily have been filed no later than April 1948 under 28 U.S.C. Sec. 2501. Because claimants' claims accrued decades before they filed suit, the trial court correctly determined that the statute of limitations had expired.
 
 
 22
 Only in 1989 did Mexico finally decline to pay any compensation to claimants under the 1941 Treaty. This event, however, does not affect the accrual date of claimants' claim. The language of the Fifth Amendment itself requires that the United States, not a foreign sovereign, commit the taking action. Langenegger v. United States, 756 F.2d 1565, 1572 (Fed.Cir.1985) ("in determining whether a taking exists where a foreign government's actions are involved, the focus of the inquiry is the same as that undertaken in a domestic taking case: the court must consider whether the United States' involvement ... warrant[s] its responsibility under the fifth amendment"). The United States ratified a treaty extinguishing all claims of Mexican nationals in 1941. In this case, this 1941 action alone satisfies the axiomatic requirement that the United States itself must undertake the specific action alleged to take private property. Mexico's 1989 decision is not a specific taking action of the United States. The trial court correctly determined that Mexico's decision created no liability for the United States. Alliance, 27 Fed.Cl. at 843.
 
 
 23
 The statute of limitations may be tolled, however, even in suits against the Government. Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed.Cir.1988). To toll the statute of limitations, a claimant must show either "that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." Japanese War Notes, 373 F.2d at 359. See also Urie v. Thompson, 337 U.S. 163, 169-70, 69 S.Ct. 1018, 1024-25, 93 L.Ed. 1282 (1949).
 
 
 24
 The Court of Federal Claims determined that claimants did not show sufficient facts to toll the statute of limitations. The trial court found that the United States Government did not conceal any material facts from the claimants. Since 1941, the United States Department of State referred Mexican claimants to Mexico for relief, but these referrals did not suspend the statute of limitations. For representations by the United States to operate as a toll, the Government must prejudicially conceal facts. Japanese War Notes, 373 F.2d at 359.
 
 
 25
 The 1941 Treaty extinguished claims of Mexican citizens against the United States. Shortly thereafter, in an action independent of the Treaty, the President of Mexico, Manuel Avila Camacho, acknowledged that these claims had become a "domestic pecuniary responsibility." Thus, in referring Mexican claimants to Mexico, the United States did not conceal material facts, but acted consistently with its view that resolution of these claims was a matter of Mexican domestic law independent of the 1941 Treaty. The trial court correctly detected an absence of prejudicial concealment on this record.
 
 
 26
 The trial court also determined that these claims were not "inherently unknowable" at the accrual date. The claimants contend that only after the 1984 Reclamantes decision could they know that they could not obtain relief from Mexico in United States courts. Until then, the claimants argue that their claims against the United States were "inherently unknowable."To the contrary, the explicit terms of the 1941 Treaty extinguished claimants' legal rights against the United States. The United States did not compel the claimants to wait until 1984 or 1990 to ascertain in court the legal effect of those terms.
 
 
 27
 Moreover, the 1941 Treaty did not create an "alternative remedy" in United States courts in the event Mexico did not compensate its citizens. Rather the Treaty expressly extinguished Mexican claims against the United States. As the trial court correctly noted, Mexican President Camacho, independent of the 1941 Treaty, agreed to compensate Mexican citizens. If any "alternative remedy" arose following the treaty, it arose by action of the President of Mexico--not by virtue of the 1941 Treaty or any other action of the United States. The Court of Federal Claims correctly concluded that these claims were not "inherently unknowable" at the accrual date.
 
 
 28
 Finally, the United States did not enter into an implied-in-fact contract with Mexican claimants to guarantee payment if the Mexican Government failed to pay. An implied-in-fact contract with the Government requires: (1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance. City of El Centro v. United States, 922 F.2d 816, 820 (Fed.Cir.1990). The United States did not at any time express an intent to contract with Mexican citizens, let alone exchange any consideration, beyond the terms of the 1941 Treaty. The Treaty itself explicitly exempted the United States from "any and all liability" for these claims. As the trial court correctly discerned, this record discloses no evidence of an implied-in-fact contract with Mexican claimants.
 
 CONCLUSION
 
 29
 On the facts pleaded, the trial court correctly awarded summary judgment to the United States. Section 2501 of Title 28 of the U.S.Code bars these claims.
 
 COSTS
 
 30
 Each party shall bear its own costs.
 
 
 31
 AFFIRMED.