Woodrow and Margaret EWALD, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 283–87L.

United States Claims Court.

Feb. 26, 1988.

Charles LeDuc, International Falls, Minn., for plaintiffs.

Larry Martin Corcoran, Dept. of Justice, Washington, D.C., with whom was James M. Spears, Acting Asst. Atty. Gen., for defendant. Albert V. Witham, Denver, Colo., of counsel.

## ORDER

ROBINSON, Judge.

This case comes before the Court after oral argument on defendant's Motion to Dismiss for Lack of Jurisdiction—Statute of Limitations. For reasons hereinafter stated, the Court grants defendant's motion. Accordingly, the Clerk shall dismiss the complaint.

*Facts*

For purposes of its motion to dismiss, defendant accepts as true the facts alleged by plaintiffs in their complaint, filed May 18, 1987.

Plaintiffs own unimproved lands in Minnesota which are within an area now called "Voyageurs National Park," directly south of the international boundary between the United States and the Dominion of Canada. The park is a specifically described area approximately 500 square miles in size at the western reach of the Laurentian Shield. Forest Indians (Ojibway) were the early inhabitants of the park area. Later, French voyageurs traversed the park area's waterways in route from Quebec to the Athabasca. Trappers, fur traders, lumber jacks, and miners used the area for more than two centuries.

Since the park is on the north slope of the continental divide, its waters flow to the Hudson Bay, providing hydroelectric power to wood pulp and paper mills which operate today at nearby International Falls, Minnesota, and Fort Frances, Ontario. The park area is also rich with vast recoverable mineral deposits, including taconite, manganese, copper, and nickel. In addition, the area supports logging, trapping, commercial fishing, and rice and berry harvesting enterprises. Because the area has such great, natural beauty, resort businesses have emerged as a principal commercial activity. Within the park itself, there are numerous private recreational residences and many unimproved properties which were suitable for subdivision and development before the park was established.

Plaintiffs claim that defendant has acted contrary to the Fifth Amendment of the Constitution since February 1968, when the National Park Service formally proposed a Voyageurs National Park, through the present, by taking plaintiffs' lands without payment of just compensation. Plaintiffs allege specifically that the taking has been effected by a series of U.S. Government actions, which include but are not limited to:

(a) Enacting in January 1971 Public Law 91–661 granting the Park Service specific authority to establish Voyageurs National Park and explicitly and flatly expressing its intention to acquire private lands, including plaintiffs, in the designated park area.

(b) Permitting and authorizing the Department of Interior to assume a proprietorship over private lands and to publicly create the impression that private owners were "former owners."

(c) Permitting and authorizing the Department of Interior to engage in public reference by means of public meetings, radio, television, newspaper, books, maps, signs, pamphlets, publications, speeches, thus intimating that private ownership within the park would be terminated and that private development, improvement, maintenance and business operations were ended and forbidden. Plaintiffs aver that such actions left private owners without a market for their lands, and injured and damaged business operations.

(d) Permitting and authorizing the Department of Interior to propose, impose, and effect rigid limitations and regulations upon means of access, access to, and the use and enjoyment of their properties.

(e) Permitting the Department of Interior to influence local boards of zoning, planning, platting, health and others to adopt and promulgate limiting and restricting rules and regulations concerning lands within the park.

(f) Permitting and authorizing the Department of Interior to enter into and engage in arrangements with conservation groups which acquired and solicited the acquisition of private properties on a discount basis under the guise of nonprofit, charitable contributions to avoid payment of taxes with governmental approval.

(g) Permitting and authorizing the Department of Interior to investigate, examine, appraise, and evaluate private lands on an owner unit basis and to withhold and refuse to disclose the information and data to private owners seeking to negotiate with defendant.

(h) Permitting and authorizing the Department of Interior to discriminate in negotiations and purchase of private property and to refuse to negotiate with unfavorable private owners.

(i) Authorizing its agents to express and announce the U.S. Government's intention to acquire private lands at a price equal to $.30 on the dollar.

(j) Acting and participating with various conservation committees in issuing and promulgating area use regulations inconsistent with private ownership and causing wide-spread publicity indicating the termination of private ownership and publicity discouraging the use, development and sale of private lands.

(k) Erecting road signs and printing maps indicating full government proprietorship and ownership and creating an atmosphere of total government ownership.

(l) Promulgating and attempting to enforce regulations prohibiting lawful use of public lands and waters and discouraging and destroying any market for the sale of private property.

(m) Establishing land, water, and air police and a patrol force to enforce use regulations which severely limit land use, which decrease and damage the market value of private property.

(n) Erecting large towers containing flashing lights which are visible for miles and operate 24 hours a day, symbolizing the presence of the U.S. Government and converting a recreational area into an airport-like collection of traffic and control lights, all reducing and impairing the market value of private property as intended.

(o) Refusing and neglecting to appropriate funds to carry out the intention to acquire private lands, permitting and authorizing the Department of Interior to transfer and shift actually appropriated funds to other park areas and to expend limited funds provided on a special, unfair, and unreasonable basis of management-selected acquisition resulting in

long and unreasonable delays in fairly acquiring the private lands intended to be acquired.

(p) Authorizing and permitting the Department of Interior to fail and refuse to institute appropriate Eminent Domain proceedings.

The plaintiffs are among a large number of Voyageurs National Park inholders who have come to the U.S. Claims Court with related allegations that the Government has taken their lands. *See, e.g., Althaus v. U.S.,* 7 Cl.Ct. 688 (1985); *Constantine v. U.S.,* 14 Cl.Ct. 339 (1988); *Christenson v. U.S.,* Cl.Ct. No. 451–85L; *Mostad v. U.S.,* Cl.Ct. No. 196–86L; *Miller v. U.S.,* Cl.Ct. No. 269–86L; *Donnelly v. U.S.,* Cl.Ct. No. 475–86L.

### Discussion

The United States may not be sued except with the consent of Congress. *U.S. v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Dalehite v. U.S.,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). A waiver of sovereign immunity is subject to any conditions imposed by Congress. *Dalehite v. U.S.,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). "In particular, '[w]hen waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity.'" *U.S. v. Mottaz,* 476 U.S. 834, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986), citing *Block v. North Dakota,* 461 U.S. 273, 287, 103 S.Ct. 1811, 1820, 75 L.Ed.2d 840 (1983). A statute of limitations is a jurisdictional prerequisite which the Court cannot waive. *Farrell v. U.S.,* 9 Cl.Ct. 757 (1986).

Every claim over which this Court has jurisdiction is barred unless the plaintiff files a complaint within six years after the claim first accrues. 28 U.S.C. § 2501. Moreover, *every* civil action against the United States is barred unless the complaint is filed within six years after the right of action first accrues. 28 U.S.C. § 2401. The only conditions which permit a claimant to avoid the limitations imposed by 28 U.S.C. § 2501 and 28 U.S.C. § 2401 are a legal disability or being beyond the seas at the time the claim accrues. In short, a statute of limitations implies that "an individual is expected to act with reasonable diligence in the protection of his interests." *Mitchell v. U.S.,* 10 Cl.Ct. 63, 67, *modified in part,* 10 Cl.Ct. 787 (1986).

The defendant contends that although the plaintiffs' complaint on its face does not disclose a date that the plaintiffs allege the U.S. Government took their lands, it is essentially identical to the complaint in *Althaus.* Defendant argues that the *Althaus* Court made an objective determination based upon facts similar to those presented in the instant case that the U.S. Government took unimproved land in Voyageurs National Park, if at all, by a course of conduct culminating in the October 3, 1980 approval of the National Park Service Acquisition Plan. While not seeking to give preclusive effect to the decision in *Althaus,* the defendant argues that the facts pled by plaintiffs in support of their claim have been determined to have occurred on or before October 3, 1980. Thus, defendant contends that because of the plaintiffs' failure to allege facts giving rise to a taking later than October 3, 1980, the plaintiffs are foreclosed by the statute of limitations from litigating their claim filed in this Court on May 18, 1987.

Plaintiffs argue that the October 3, 1980 taking date established in *Althaus* does not apply to them. Rather, plaintiffs contend that the defendant's actions were continuous, and that their claim did not accrue until the situation had become "stabilized." *U.S. v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). Thus, plaintiffs urge that the date the situation stabilized was August 15, 1984, when the Final Land Protection Plan for Voyageurs National Park was approved, because "[d]uring the period of time between the Land Acquisition Plan and the Final Land Protection Plan of 1984, the Government exhibited a great deal of vacillation in its policies and procedures which give rise to the actual issue of taking." Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss for Lack of Jurisdiction—Statute of Limitations, 3. Further, plaintiffs contend

that it is conceivable that the Government could create policies involving land use and land protection in Voyageurs National Park in such a fashion as to bring to fruition a cause of action on a temporary taking.

The Court is mindful that "[j]ust compensation jurisprudence is uniquely fact intensive." *Juda v. U.S.*, 6 Cl.Ct. 441, 450 (1984). Thus, "[d]enial of a taking claim on the basis of the defense of limitations is warranted only when the facts alleged demonstrate conclusively that such a decision is required as a matter of law." *Id.* The issue, then, "is the time the statute of limitations must commence to run because the fact of a taking by the United States no longer can be in controversy." *Peter v. U.S.*, 6 Cl.Ct. 768, 774 (1984).

"Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in the course of time." *Dickinson*, 331 U.S. at 748, 67 S.Ct. at 1385. The statute of limitations begins to run as of the date the government's actions result in the physical invasion of plaintiff's property, or on the date the government's actions amount to a substantial interference with an owner's use and enjoyment of the property. *U.S. v. Louisiana*, 446 U.S. 253, 100 S.Ct. 1618, 64 L.Ed.2d 196 (1980); *U.S. v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Eyherabide v. U.S.*, 345 F.2d 565, 170 Ct.Cl. 598 (1965).

Even though plaintiffs argue that their cause of action did not arise until the "situation stabilized" on August 15, 1984, this Court finds it instructive that a competent court in *Althaus* found under *Dickinson* on similar facts that:

> At least since the final land acquisition plan of October 3, 1980, was issued, the event the court views as the consummation and date of taking, plaintiffs were frozen in place. The significance of this plan is that it draws together and, in effect, ratifies what had occurred to that date in the development of the park, and projects no change, or expectation for change in the future. It memorializes the status of plaintiffs' properties in a public document and confirms the restrictions on their use and the likely response of the restrictions were transgressed. Issuance of the document was the climatic event in the progressive taking of the properties in this case. Whatever the debate over the actionability of events and acts, individually or cumulatively, before October 3, 1980, the court finds any taking was complete by then.

*Althaus*, 7 Cl.Ct. at 695.

Since the present plaintiffs were not parties to *Althaus*, they are not bound by the *Althaus* decision, nor are they precluded from alleging facts which fix the accrual of their cause of action later than October 3, 1980. Surely, though, since the issuance of the October 3, 1980 Land Acquisition Plan, there has never been any doubt as to the Government's intention to take a full interest in plaintiffs' lands, either by purchase, transfer or condemnation, as directed by Congress. *See, United States v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958); *Hilkovsky v. U.S.*, 205 Ct.Cl. 460, 466, 504 F.2d 1112, 1114 (1974). That plaintiffs were aware of the Government's intention is clear on the face of their complaint. In addition, the Court has compared both the 1980 Land Acquisition Plan and the 1984 Land Protection Plan and finds the two virtually indistinguishable. Therefore, the Court is convinced that the situation in Voyageurs National Park had stabilized sufficiently by October 3, 1980, for the plaintiffs to bring their inverse condemnation action. In this situation, no later action by the Government can effect an additional taking, because the Government had taken the lands entirely by October 3, 1980, or not at all. Plaintiffs' vague assertions that the Government exhibited a "great deal of vacillation in its policies and procedures" are insufficient to persuade the Court that a trial on the issue of accrual for purposes of the statute of limitations is warranted. Thus, it is plaintiffs' general failure of proof which would give rise to a later taking that compels the Court to dismiss plaintiffs' complaint.

Finally, whether a taking is characterized as "temporary" or "permanent" is of little significance in a determination as to whether a taking in fact has occurred. *Peter v. U.S.*, 6 Cl.Ct. at 774. The fact that the United States eventually returns the use of property to the person from whom it has been taken does not alter the taking date. *Id.*, citing *U.S. v. Dickinson*, 331 U.S. at 749, 67 S.Ct. at 1385; *U.S. v. Dow*, 357 U.S. at 27, 78 S.Ct. at 1047; *Yuba Goldfields, Inc. v. U.S.*, 723 F.2d 884, 888 (Fed.Cir.1983). Thus, the Court finds no merit in plaintiffs' argument that a change in Government policy with respect to Voyageurs National Park could bring to fruition a spate of temporary taking cases. Rather, a change in Government policy would have bearing only on the measure of damages.

### Conclusion

This Court does not have jurisdiction over claims which are filed more than six years after the cause of action first accrues. Plaintiffs filed with this Court on May 18, 1987, their inverse condemnation action based upon allegations which this Court finds to have occurred on or before October 3, 1980. No facts pled in plaintiffs' later filing persuade this Court otherwise. Since plaintiffs have filed their complaint more than six years beyond the time their action first accrued, this Court has no jurisdiction over the claim. Accordingly, the Clerk is directed to dismiss the complaint. No costs.